```
                                                            FILED
                                                    IN CLERK'S OFFICE
                                                U.S. DISTRICT COURT E.D.N.Y.
                                                    ★ NOV 14 2014 ★
                                                    BROOKLYN OFFICE
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
TOPNOTCH TENNIS TOURS, LLC,
dba GRAND SLAM TENNIS TOURS,

                    Plaintiff,

-against-

GLOBAL TENNIS CONNECTIONS LIMITED,

                    Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**

13-CV-4844 (SLT)(VMS)

**TOWNES, United States District Judge:**

      Topnotch Tennis Tours, LLC ("Topnotch") filed this diversity action against Global Tennis Connections Limited ("Global Tennis") on August 28, 2013, alleging breach of contract and alternative claims for conversion, unjust enrichment, and promissory estoppel. (ECF No. 1.) Defendant Global Tennis filed its motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) on April 26, 2014. (ECF No. 11.) For the reasons set forth below, Defendant's motion is denied.

## LEGAL STANDARD

      On a motion to dismiss for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted). Because Global Tennis brings this motion prior to discovery, Topnotch may defeat this motion "by making a prima facie showing of jurisdiction by way of the complaint's allegations, affidavits, and other supporting evidence." *Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 285 (E.D.N.Y. 2005) (citations omitted). "Furthermore, in considering a Rule 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be

resolved in plaintiff's favor." *Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F. Supp. 2d 276, 287 (E.D.N.Y. 2013) (citations omitted). However, conclusory statements, without supporting facts, will not suffice. *Mirman v. Feiner*, 900 F. Supp. 2d 305, 309 (E.D.N.Y. 2012) (citation omitted).

## BACKGROUND

The Court recites the following facts from the complaint and affidavits submitted by the parties. The Court assumes these facts to be true only for the purpose of deciding this motion and construes them in the light most favorable to Topnotch, the non-moving party.

This case arises from a contract dispute between Topnotch, a Vermont limited liability company with its principal place of business in Stowe, Vermont, and Global Tennis, a corporation organized and existing under the laws of Great Britain with its principal place of business in London, England. (Compl. ¶¶ 3–4, ECF No. 1.) Topnotch organizes tennis packages that include hotel accommodations, tickets to tennis tournaments, and meet-and-greet sessions with professional tennis players. (*Id.* at ¶ 5.) Global Tennis scouts, represents, and promotes professional tennis players. (*Id.* at ¶ 7.)

Andrew Chmura, president and owner of Topnotch, met John Morris, a Global Tennis director, at the 2012 US Open in New York after previously discussing the possibility of doing business together. (Chmura Aff. ¶¶ 2, 25, ECF No. 12-1.) During this meeting, which lasted approximately one hour, Morris solicited Topnotch's sponsorship of players represented by Global Tennis. (*Id.* at ¶ 27.) Morris and Chmura also discussed the purchase of Wimbledon tickets and the use of Topnotch's Wimbledon hospitality house. (*Id.* at ¶ 31.) Morris indicated that he had a good contact for securing Wimbledon Debenture tickets. (*Id.* at ¶ 33.) Debenture

tickets cover a five-year period and include a badge that provides access to the Debenture Holder's Lounge, which provides "a certain prestige." (*Id.* at ¶ 34.)

After this meeting, Chmura and Morris communicated via text message, e-mail, and telephone about Topnotch's purchase of Wimbledon tickets from Global Tennis. (*Id.* at ¶ 38.) The parties' submissions do not indicate whether any of these communications were directed at New York, but Global Tennis states all of its communications originated in the UK. (Morris Aff. ¶ 9, ECF No. 11-1.) In January 2013, Chmura and Morris met at the Australian Open to continue negotiating the purchase of Wimbledon tickets. (Chmura Aff. ¶ 40.) The parties then signed a contract in Melbourne, Australia. (*Id.* at ¶ 40; Morris Aff. ¶ 10.) The contract required Global Tennis to provide Topnotch 78 Wimbledon tickets. (Compl. ¶ 11, ECF No. 1.)

In 2013, Wimbledon was scheduled to begin on June 24. (*Id.*) Topnotch completed timely payment for the tickets by May 20, 2013. (*Id.* at ¶ 12.) The contract required Global Tennis to send the tickets to Topnotch by June 9, 2013. (*Id.* at ¶ 13.) After Global Tennis failed to deliver the tickets by June 9, Morris told Chmura that Morris had "picked [the tickets] up and noticed the 4 weren't together, it was an honest mistake and they have our 4 together but I need to collect them again and swap them over." (*Id.* at ¶ 14.) But prior to the start of Wimbledon on June 24, Global Tennis provided Topnotch with only 24 of the 78 tickets. (*Id.* at ¶ 16.) Topnotch secured replacement tickets at a cost of £128,100. (*Id.* at ¶¶ 23–24.) However, because some of these tickets did not meet the promised standards, Topnotch refunded $60,266 to its customers. (*Id.* at ¶ 24.)

## PROCEDURAL HISTORY

Topnotch filed this diversity action against Global Tennis on August 28, 2013, alleging breach of contract and alternative claims for conversion, unjust enrichment, and promissory

estoppel. (ECF No. 1.) Global Tennis filed this motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) on April 26, 2014. (ECF No. 11.) The parties conducted no discovery and the Court has not held an evidentiary hearing on the issue of personal jurisdiction.

## DISCUSSION

"As a general rule, 'the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with "federal law" entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)). This Court must determine: "(1) whether New York law would confer jurisdiction by New York courts over the defendant, and (2) whether the exercise of jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment." *Allied Dynamics*, 965 F. Supp. 2d at 289 (citation omitted).

Global Tennis argues that New York's long-arm statute, C.P.L.R. § 302(a)(1), does not provide a basis for personal jurisdiction and that this Court's exercise of personal jurisdiction over Global Tennis would not comport with due process. (Mem. Supp. 8–12, ECF No. 11-3.) Topnotch argues that personal jurisdiction exists over Global Tennis based on service of the summons and complaint on a Global Tennis director physically present in New York. (Mem. Opp. 8–10, ECF No. 12.) Alternatively, Topnotch argues that New York's long-arm statute provides a proper basis for personal jurisdiction. (*Id.* at 10–13.)

## A. Transient Jurisdiction

Topnotch relies on *Burnham v. Superior Court of California, County of Marin*, 495 U.S. 604 (1990), for its argument that service of the summons and complaint on a Global Tennis director physically present in New York provides a proper basis for jurisdiction. In *Burnham* the Supreme Court held that the Due Process Clause does not prohibit a state court from exercising personal jurisdiction over a defendant based on in-state service of process. 495 U.S. at 628. The petitioner husband in *Burnham* travelled from New Jersey to California to conduct some business and visit his children, who lived with their mother in California. *Id.* at 608. While in California, petitioner's wife served him with a summons and divorce petition. *Id.* The husband moved in California Superior Court to quash the service of process on the ground that the California court lacked personal jurisdiction over him because of his minimal contacts with California. *Id.* The Superior Court denied the husband's motion, and the California Court of Appeal denied mandamus relief, holding that an individual defendant's presence and service within the state provided "a valid jurisdictional predicate for *in personam* jurisdiction." *Id.* (citation omitted). The Supreme Court affirmed, noting that "[a]mong the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State." *Id.* at 610.

Topnotch argues that the principle affirmed by the Supreme Court in *Burnham* extends to entities like Global Tennis. In support of this position, Topnotch points to the Second Circuit's decision in *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998). In *First American*, the Second Circuit found that personal service upon a partner provided an adequate basis for personal jurisdiction over the partnership entity pursuant to C.P.L.R. § 310(a) and comported with due process. 154 F.3d at 19–21. However, unlike *First American*, this case

does not involve a partnership but a corporation. Topnotch offers no substantive analysis as to why this Court should find that New York law provides for transient jurisdiction over a corporation. Rather, at least one district court, after a detailed analysis of New York's long-arm statute and decisions of the New York Court of Appeals, has held that "New York law does not provide for transient jurisdiction to be had over corporations where the corporation is not continuously and systematically 'doing business' in New York." *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 956 F. Supp. 1131, 1137 (S.D.N.Y. 1997); *see also First Am.*, 154 F.3d at 19 ("One commentator has pointed out the absence of any additional requirement that a partnership be doing business in New York, and attributes that omission to the fact that a partnership (unlike a corporation) has no separate existence." (citing Joseph M. McLaughlin, N.Y. C.P.L.R. § 310, Practice Commentaries, at 371 (McKinney 1990))).

The facts before the Court indicate Global Tennis was not "doing business" in New York, and Topnotch does not attempt to argue that Global Tennis meets this more restrictive standard. Thus, personal service on Morris does not create a basis for this Court to exercise personal jurisdiction over Global Tennis. *See Kahn Lucas Lancaster*, 956 F. Supp. at 1138 ("Plaintiff does not attempt to argue that [defendant] has sufficient contacts with New York to establish 'doing business' under the CPLR § 301 test, and thus there is no jurisdiction based on [plaintiff]'s personally serving [defendant's general merchandise manager] in New York.").

### B. New York's long-arm statute

Alternatively, Topnotch argues that New York's long-arm statute, C.P.L.R. § 302(a)(1), provides a basis for personal jurisdiction over Global Tennis. (Mem. Opp. 10–13, ECF No. 12.) Section 302 provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts

anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citation omitted).

### 1. Transacted business

Regarding the "transacted business" prong, there exists "no fixed standard by which to measure the minimal contacts required to sustain jurisdiction under the provisions of CPLR 302." *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 381–82, 229 N.E.2d 604, 607 (1967). "But at a minimum, a defendant who 'transacts business' in New York must 'purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003) (quoting *McKee*, 20 N.Y.2d at 382, 229 N.E.2d at 607). A court must consider the totality of the circumstances "and may not subject the defendant to jurisdiction based on 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).

Although "[t]he test for transacting business under 302(a)(1) in contract actions can be somewhat imprecise," certain principles guide this analysis. *See id.* (citations omitted). First, contract negotiations that indicate a purposeful invocation of New York law qualify as transactions of business. *Id.* (citing *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F. Supp. 13, 16 (S.D.N.Y. 1996)). "It does not matter whether the negotiations are preliminary, whether the contract is executed in New York, or whether performance is contemplated for New York." *Id.* Second, "[c]ontract negotiations in New York will satisfy [§ 302(a)(1)] if the discussions

'substantially advanced' or were 'essential to' the formation of the contract or advanced the business relationship to a more solid level." *Id.* (quoting *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*, 775 F. Supp. 650, 655 (S.D.N.Y. 1991)). The duration of the negotiations is not critical, and even a single short meeting can suffice. *Moser v. Boatman*, 392 F. Supp. 270, 273 (E.D.N.Y. 1975) (citation omitted). Moreover, "[j]urisdictional significance can be attached to a 'social' visit during which substantive business discussions took place which substantially furthered the parties' business relationship." *Premier Lending*, 924 F. Supp. at 16 (citing *CutCo*, 806 F.2d at 367); *see also Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*, 600 F. Supp. 731, 737 (E.D.N.Y. 1985) ("Meetings which are partially social in nature, as well as meetings which merely create the likelihood of a more solid business relationship are a sufficient basis for the exercise of in personam jurisdiction." (citation omitted)).

Here, the meeting and negotiations in New York substantially advanced the business relationship and formation of the contract at issue between Topnotch and Global Tennis. Topnotch and Global tennis "went from a non-existent business relationship before the meeting to a situation in which they were discussing aspects of a prospective contract for the sale of a specific product," the Wimbledon Debenture tickets. *See SAS*, 245 F. Supp. 2d at 549. Chmura's affidavit also shows that the parties discussed sources from which to procure Debenture tickets and the details of the Debenture tickets Topnotch sought. *See Interface*, 600 F. Supp. at 736 (finding that allegations of a discussion of "manufacturing details, alternative sizes and shapes for the product, potential areas of application and marketing ideas" sufficed to show "substantial negotiations took place in New York and that those negotiations significantly advanced the formation of an agreement"). The parties finalized the contract a few months after

the New York meeting. (Chmura Aff. ¶ 40, ECF No. 12-1.) At this stage, Topnotch has met its burden of showing Global Tennis transacted business in New York.

**2. Arises out of**

Regarding the second prong, a claim "arises out of" a defendant's transaction of business in New York "when there exists a substantial nexus between the business transacted and the cause of action sued upon." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) (citation and internal quotation marks omitted). "The defendant['s] New York activities must be substantially proximate to the allegedly unlawful act before the cause of action can be said to arise out of those activities." *SAS*, 245 F. Supp. 2d at 548 (citation and internal quotation marks omitted). The plaintiff bears the burden of securing jurisdiction with respect to each claim. *Id.* Topnotch alleges breach of contract and alternative claims for conversion, unjust enrichment, and promissory estoppel. (Compl. ¶¶ 27–41, ECF No. 1.)

The negotiations discussed above culminated in the agreement upon which all of Topnotch's claims are based. Topnotch thus satisfies the second prong. *See Edel Gems, Inc. v. Cont'l Jewelers, Inc.*, No. 91 Civ. 7030 (JSM), 1992 WL 88174, at *3 (S.D.N.Y. Apr. 20, 1992) (finding nexus requirement satisfied where claims "resulted from the understanding allegedly reached at the New York meeting"); *SAS*, 245 F. Supp. 2d at 551 ("[T]he combined effect of [defendant's New York] activities . . . was, allegedly, to create a potentially [long]-lasting business relationship between [the parties], pursuant to which [plaintiff] undertook to promote the sale of [defendant's] product. It is out of that relationship that these claims arise." (internal quotation marks and citation omitted)).

## C. Due Process

Having found an adequate basis for long-arm jurisdiction over all of Topnotch's claims, the Court must next determine whether the exercise of personal jurisdiction over Global Tennis comports with due process. This involves two components: (1) the minimum contacts inquiry; and (2) the reasonableness inquiry. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (citation omitted).

### 1. Minimum Contacts

A court may exercise personal jurisdiction over a foreign defendant if that defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted). "Because the 'purposeful availment' requirement of N.Y. C.P.L.R. § 302(a)(1) derives directly from *Hanson* [*v. Denckla*, 357 U.S. 235 (1958)], . . . 'satisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 365 (S.D.N.Y. 2004) (citation omitted); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (noting that it would be "rare" that due process would prevent a court from exercising personal jurisdiction over a defendant who meets the requirements of New York's long-arm statute).

The jurisdictional basis for Topnotch's claims is the meeting and negotiation between the parties in New York. Topnotch's claims against Global Tennis all arise from the contract that emerged from this initial negotiation. The Court finds that Global Tennis purposefully availed itself of the privileges and benefits of New York law through the presence of one of its directors at the New York negotiations with Topnotch and could reasonably have foreseen being haled to

a New York court. *See CutCo*, 806 F.2d at 368 ("[N]egotiations and discussions in the forum state relevant to the formation of a contract constitute the purposeful transaction of business for an action arising out of the alleged breach of that contract." (citing *Capitol Cabinet Corp. v. Interior Dynamics, Ltd.*, 541 F. Supp. 588, 590 (S.D.N.Y. 1982))). Other courts within the Second Circuit have found the exercise of personal jurisdiction appropriate in similar circumstances. *See, e.g., NW Direct Design & Mfg., Inc. v. Global Brand Mktg., Inc.*, No. 98 Civ. 4756(LAP), 1999 WL 493348, at *3 (S.D.N.Y. July 12, 1999) (finding jurisdiction existed over defendant on basis of defendant's officer's presence at negotiations held in New York).

### 2. Reasonableness

The Court looks to five factors in determining the reasonableness of the exercise of jurisdiction over a defendant:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Chloé*, 616 F.3d at 164–65 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987)). Because Topnotch has made a threshold showing of minimum contacts, Global Tennis "must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez* (*Bank Brussels Lambert II*), 305 F.3d 120, 129 (2d Cir. 2002) (citation omitted).

Global Tennis argues that "[t]he costs of defending the action in New York would be so high as to create a substantial and undue burden on [Global Tennis]." (Morris Aff. ¶ 16, ECF No. 11-1.) The Court acknowledges that litigating this action in New York would impose some cost on Global Tennis, which is principally located in England. But the resultant burden, if any, is limited. *See Bank Brussels Lambert II*, 305 F.3d at 129–30 ("Even if forcing the defendant to

-11-

litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" (citation omitted)). And in any case, "[t]he inconvenience . . . cuts both ways since all of [Plaintiff's] witnesses would have to travel to [England] if the case were brought there." *See Chloé*, 616 F.3d at 173. Global Tennis does not argue that any other factors weigh against jurisdiction. Nor does it appear to the Court that they would.

In light of this Court's finding that Topnotch has made a threshold showing of minimum contacts, Defendant's conclusory, "generalized complaints of inconvenience [and cost] arising from having to defend . . . from suit in New York do not add up to a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *See id.* (citation and internal quotation marks omitted). The Court therefore finds that asserting jurisdiction over Global Tennis comports with "traditional notions of fair play and substantial justice" and satisfies the Due Process Clause's reasonableness inquiry.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss (ECF No. 11) is denied. Global Tennis shall file its answer within fourteen days from entry of this Order.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: November 10, 2014
Brooklyn, New York